

**IT IS ORDERED as set forth below:**

**Date: March 30, 2023**

_____
**Lisa Ritchey Craig**
**U.S. Bankruptcy Court Judge**

_____

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| IN THE MATTER OF: | : | CASE NUMBERS |
| | : | |
| HENRY C. HARDIN, III | : | BANKRUPTCY CASE |
| | : | 18-70395-LRC |
| Debtor. | : | |
| _____ | : | |
| | : | |
| ZURICH AMERICAN INSURANCE CO., | : | ADVERSARY PROCEEDING |
| AMERICAN ZURICH INSURANCE CO., | : | NO. 19-05145-LRC |
| THE ZURICH SERVICES CORP., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| HENRY C. HARDIN, III, | : | IN PROCEEDINGS UNDER |
| | : | CHAPTER 7 OF THE |
| Defendant. | : | BANKRUPTCY CODE |

<u>**ORDER**</u>

Debtor Henry C. Hardin, III ("Hardin") and his companies had a contractual

relationship with Plaintiffs Zurich American Insurance Company, American Zurich Insurance Company, and The Zurich Services Corporation (collectively, "Zurich") that resulted in a multi-million-dollar arbitration judgment against Hardin's companies. Zurich later sued Hardin to establish that he was the alter ego of one of the companies and, therefore, is liable under Georgia law for the company's debts. Zurich also sued Hardin and his wife for fraudulent transfers of assets, but that suit was interrupted by Hardin's filing bankruptcy. Now Zurich has filed a complaint seeking a determination that its debt is nondischargeable, pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6), because it arose from fraud and a willful and malicious injury (the "Complaint"). Hardin has moved for judgment on the pleadings (the "Motion," Doc. 54), arguing that, even if the facts of the Complaint are true, Zurich's claim fails as a matter of law because the debt at issue preexisted the alleged fraud and willful and malicious injury and is simply an ordinary contract debt. Zurich opposes the Motion.[1]

## FACTS

From 2004 through 2012, Zurich provided workers compensation insurance to several companies owned by Hardin, including Professional Management Services Group, Inc. ("PMSG"). Complaint, ¶¶ 1, 14. For each of the policy years, the parties agreed that the insurance programs would be loss sensitive, meaning PMSG agreed to

---

[1]  This matter constitutes a core proceeding, over which this Court has subject matter jurisdiction. *See* 28 U.S.C. § 157(b)(2)(I), § 1334.

assume responsibility for a portion of the insurance risk. *Id.*, ¶ 15.  In a loss sensitive program, additional amounts may become due after the policy expiration date based on how the losses develop over time.  *Id.*  Here, the loss sensitive component was structured in two ways: (a) large deductible programs, and (b) retrospectively-rated programs.  *Id.* Zurich complied with its obligations under the insurance program.  *Id.*, ¶ 18.  Although Zurich sent invoices to PMSG that reflected the amounts PMSG was obligated to pay Zurich for losses, PMSG repeatedly failed to pay amounts owed to Zurich as reflected on the invoices (the "Obligations").  *Id.*, ¶¶ 18-19.

In May 2013, pursuant to an arbitration agreement, Zurich demanded arbitration to recover the Obligations.  *Id.*, ¶ 19.  On May 7, 2015, the arbitrators, having considered the arguments, testimony, and evidence presented, entered a Final Award requiring PMSG to (a) pay Zurich $16,307,224 in principal and interest, and (b) post $1,355,480 in collateral with Zurich.  *Id.*, ¶ 20.  On July 23, 2015, the United States District Court for the Northern District of Illinois, Case No. 1:14-cv-03454, confirmed the final award and entered a final judgment in favor of Zurich and against PMSG.  *Id.*, ¶ 21.  PMSG, however, did not pay any of the amounts due for this judgment because Hardin had ceased PMSG's operations and transferred its remaining assets to himself.  *Id.*

On June 28, 2016, Zurich filed a Complaint against Hardin in the United States District Court for the Northern District of Georgia, Case No. 1:16-cv-02312 (the "Alter

Ego Case"), contending that, as the alter ego of PMSG, Hardin is responsible for PMSG's debt to Zurich. *Id.*, ¶ 22. A jury trial was held and concluded on June 8, 2018, with a verdict in favor of Zurich and against Hardin in the total amount of $18,102,582 (the "Alter Ego Judgment"). *Id.*, ¶ 23. The jury determined that Hardin abused the corporate form and the corporate veil must be pierced, such that Hardin was personally responsible for PMSG's debt to Zurich. *Id.*, ¶ 32. As of the time of the filing of the Complaint, through garnishments, attachments, and other collection efforts, Zurich had recovered a total of $572,480.20 from Hardin, and $17,530,101.80, plus post-judgment interest, remains outstanding on the Judgment. *Id.*, ¶ 25.

Prior to the entry of the Judgment and the Alter Ego Judgment, each month, Hardin directed PMSG to pay his wife, Linda Hardin, $7,000 for personal household expenses. *Id.*, ¶ 31. Mrs. Hardin did not work for PMSG, and the monthly transfers served no business purpose. *Id.* Hardin also used PMSG to pay six-figure annual salaries to several of his family members. *Id.* Hardin siphoned-off corporate funds to pay personal expenses, including $600,000 transferred from the PMSG bank account into the bank account for Staffing Concepts National, Inc. ("SCN"), another company 100% owned and controlled by Hardin, which SCN used to pay Hardin $380,000 in cash, $19,782 for Hardin's family vacation in Europe, $15,367 to sponsor the Nightmares, a rock band fronted by Hardin's son, and $7,650 to sponsor the Silverbacks, a professional

4

soccer team of which Hardin was then part owner. Hardin routinely used his corporate credit card from PMSG for personal use, including purchasing presents for his wife from Gucci, Prada, and Tiffany. *Id*. Additionally, Hardin invested with a family member in a sand mine without adequate diligence and without commercially reasonable collateral or payment terms. When the investment proved worthless, Hardin sold the investment to PMSG. Through this transaction, Hardin made himself whole on the investment, while PMSG recovered nothing and ultimately wrote-off the investment as a total loss. *Id*. Hardin also used PMSG's monies to fund monthly payments to himself totaling $2.5 million for amounts owed to him by his brother, John Hardin. John Hardin has not reimbursed PMSG for $2.28 million of this debt and refuses to do so, contending that the debt is offset by other amounts Hardin owes him from other entities. PMSG was thus out millions, while Hardin received from PMSG in cash the full $2.5 million owed to him by John Hardin. *Id*. From 2005 through 2015, Hardin took out numerous unsecured, interest-free loans from PMSG without formal documentation, repayment schedules, securities posted, or interest charged. *Id*. The balance owed to PMSG from Hardin fluctuated significantly over the years and was as high as $697,274 in 2010. *Id*.

Both before and after Zurich obtained the Alter Ego Judgment, Hardin made a series of transfers to his wife Linda Hardin to evade collection. *Id*., ¶ 33. Specifically, with the actual intent to hinder, delay, or defraud Zurich: (1) on October 11, 2017, one

month after Zurich and Hardin submitted a consolidated pretrial order in the Alter Ego
Case, after which the case was set for the January 22, 2018, trial calendar, Hardin
abruptly transferred his $1.4 million home to Mrs. Hardin, who paid nothing for this
interest; (2) after Zurich commenced the Alter Ego Case, shortly before the trial in the
Alter Ego Case, and even after Zurich obtained the Alter Ego Judgment, Hardin made
numerous cash transfers to Mrs. Hardin totaling at least $622,677; (3) from July 30, 2015,
through December 2016, Hardin signed and funded monthly checks totaling $310,300
that were used to pay for the Hardins' million dollar lake house, the deed to which was
issued in the name of Mrs. Hardin only in August 2017, just two weeks before Zurich and
Hardin submitted their consolidated pretrial order in Zurich's Alter Ego Case against him,
after which the case was set for the January 22, 2018 trial calendar; (4) on December 15,
2011, at the time Hardin was ending PMSG's insurance program with Zurich, Hardin
transferred his $500,000 farm house to Mrs. Hardin, who paid nothing for this interest;
and (5) from June 2016 through January 2017, Hardin signed and funded checks totaling
$83,000 that he used to purchase an ownership interest in a Restorative Health facility for
Mrs. Hardin. *Id.*, ¶ 34.

 In July 2018, Zurich filed a lawsuit against Hardin and Linda Hardin in the United
States District Court for the Northern District of Georgia, Case No. 1:18-cv-03319-MLB,
asserting claims for fraudulent transfer and civil conspiracy (the "Fraudulent Transfer

Case"). *Id*. The Fraudulent Transfer Case was stayed when Hardin filed for bankruptcy. *Id*.

On June 26, 2018, Zurich moved to garnish Hardin's known bank accounts, including his accounts at Bank of America. *Id*., ¶ 36. Hardin did not respond to the motion by the July 10th deadline, and Zurich filed a reply on July 12th requesting immediate entry of the garnishment. *Id*. The court issued the summons of garnishment on July 17th. *Id*. With the actual intent to hinder, delay, or defraud Zurich, on July 11, 2018—one day after the deadline for responding to the motion for garnishment had lapsed—Hardin withdrew $35,000 from the Bank of America account and sent it to the Jones & Walden firm, whom Hardin had recently retained. *Id*., ¶¶ 37, 42. Jones & Walden did not accept the $35,000 for work already performed, but instead as a deposit towards work to be performed in the future. *Id*. In the following weeks, also with the actual intent to hinder, delay, or defraud Zurich, Hardin transferred an additional $63,000 to Jones & Walden from his account at TD Ameritrade, including amounts to be held by Jones & Walden on deposit for future work to be performed. *Id*., ¶¶ 38, 42. Hardin did not disclose the TD Ameritrade account to Zurich until he belatedly responded to Zurich's interrogatory requests on August 7, 2018, by which time little remained in the account. *Id*. Hardin opened the TD Ameritrade account in Spring 2018 with transfers from his Merrill Lynch account (known to Zurich), so that when Zurich garnished the Merrill

7

Lynch account in June 2018 nothing remained.  *Id.*, ¶ 39.  Hardin concealed the transfers to Jones & Walden from Zurich.  Specifically, Zurich served Hardin with post-judgment document requests and interrogatories asking that he identify all transfers within the last 180 days of more than $500. Hardin did not disclose any of the transfers to Jones & Walden in his responses to these requests. But for the transfers, the $98,000 Hardin deposited with Jones & Walden would have been garnished by Zurich.  *Id.*, ¶ 40.

Since Zurich obtained its Judgment, Hardin has also continued to pay the debts of insiders while avoiding payment to Zurich, including (1) paying off the loan his wife took out for the late model Mercedes (driven by the Hardins' daughter); and (2) paying down the $418,256 mortgage on the home residence in the amount of $3,636 per month, notwithstanding the fact that Hardin does not own the home "on paper."  *Id.*, ¶¶ 45-46. Hardin also wrongfully held a $509,000 check hostage in his desk drawer until compelled to release the check through a temporary restraining order.  *Id.*, ¶ 48.

### CONCLUSIONS OF LAW

In the Complaint, Zurich contends that "Hardin has willfully and maliciously injured Zurich based on all of his conduct alleged above, including but not limited to: (a) PMSG's debt incurred under its insurance program with Zurich, (b) Hardin's operation of PMSG as his alter ego, (c) Hardin's fraudulent transfers both before and after the alter ego trial, (d) Hardin's additional efforts to thwart Zurich's collection efforts, and (e)

Hardin's bad acts leading up to and in connection with this bankruptcy action."

Complaint, ¶ 57. Additionally, Zurich asserts that "Zurich's Claim is non-dischargeable

because it is based on a debt 'for money, property, services or an extension, renewal, or

refinancing of credit . . . obtained by—false pretenses, a false representation, or actual

fraud, other than a statement respecting the debtor's or an insider's financial condition."

*Id.*, ¶ 62. "Hardin's false pretenses, false representations, and/or actual fraud are based on

all of his conduct alleged above, including but not limited to: (a) PMSG's debt incurred

under its insurance program with Zurich, (b) Hardin's operation of PMSG as his alter ego,

(c) Hardin's fraudulent transfers both before and after the alter ego trial, (d) Hardin's

additional efforts to thwart Zurich's collection efforts, and (e) Hardin's bad acts leading

up to and in connection with this bankruptcy action." *Id.*, ¶ 63.

  A. *Rule 7012 Standard*

  In accordance with Federal Rule of Civil Procedure 12(c) (applicable to

bankruptcy proceedings under Rule 7012(b) of the Federal Rules of Bankruptcy

Procedure), "[a]fter the pleadings are closed--but early enough not to delay trial--a party

may move for judgment on the pleadings." Fed. R. Civ. P. 12(c); *see also In re Dorsey*,

497 B.R. 374, 381 (Bankr. N.D. Ga. 2013). "Failure to state a claim upon which relief

can be granted . . . may be raised . . . by a motion under Rule 12(c)." Fed. R. Civ. P.

12(h)(2). "The standard of review for a motion for judgment on the pleadings 'is almost

identical to that used to decide motions to dismiss.'" *Matter of VanBrocklin*, 566 B.R. 90, 95 (Bankr. N.D. Ga. 2017).   Consequently, the Court considers "whether [Zurich's] complaint contains sufficient factual allegations 'to state a claim to relief that is plausible on its face.'" *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). Judgment is appropriate where the Court concludes that Zurich "would not be entitled to relief under any set of facts that could be proved consistent with the allegations.'" *Id*.

In ruling on a motion for judgment on the pleadings, the Court must "'accept all facts in the complaint as true and view those facts in the light most favorable to the plaintiff.'"   *In re Gaddy*, 977 F.3d 1051, 1055–56 (11th Cir. 2020), cert. denied sub nom. *SE Prop. Holdings, LLC v. Gaddy,* 209 L. Ed. 2d 548, 141 S. Ct. 2514 (2021).   Courts interpret this standard through "the lens of Rule 8(a), made applicable herein through Bankruptcy Rule 7008, which requires that a pleading contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *In re Diget*, 2021 WL 4484871, at *5 (Bankr. N.D. Ga. Sept. 30, 2021) (quoting Fed. R. Civ. P. 8(a)(2)).[2]   That

---

[2] The Court rejects Zurich's argument that the Motion is untimely.  Under Rule 12(c), a motion for judgment on the pleadings is timely so long as it is filed early enough that it does not delay trial.  The filing of the Motion within a few months of the resolution of Zurich's appeal of this Court's order denying Zurich summary judgment did not delay trial, and, therefore, the Court exercises "its wide discretion" to find "it appropriate to consider the Motion . . . rather than waiting to address the matter at trial." *In re Alvarado*, 2019 WL 1209751, at *2 (Bankr. W.D. Okla. Mar. 14, 2019).  Further, as Hardin argues, he complied with the deadline contained in the Order approving Report of Rule 26(f) Conference. *See* Doc. 53 ("All dispositive motions will be filed by December 9, 2022.").  Even if, as Zurich contends, L.R. 7.1(A)(2) (N.D. Ga.) applies to this adversary proceeding, Hardin "obtained prior permission of the Court to file later" than thirty days after the beginning of discovery, such that the Motion was timely filed.

being said, the "heightened pleading standard enumerated in Bankruptcy Rule 7009 and Rule 9(b)" applies to claims under § 523(a)(2)(A), although the "intent element of fraud claims may . . . be alleged generally." *In re White*, 2021 WL 450992, at *6 (Bankr. W.D. Okla. Feb. 8, 2021); *In re Moss*, 598 B.R. 508, 512 (Bankr. N.D. Ga. 2019) (citing *Lamar, Archer & Cofrin, LLP v. Appling*, __ U.S. __, 138 S.Ct. 1752, 1758-59, 201 L.Ed.2d 102 (2018)). Finally, "at the pleadings stage . . . the Court must draw all inferences in the light most beneficial to Plaintiff." *In re Wells-Lucas*, 2021 WL 1234454, at *12 (Bankr. N.D. Ga. Mar. 31, 2021).

B.    *Nondischargeability*

A presumption exists that all debts owed by the debtor are dischargeable unless the party contending otherwise proves nondischargeability. 11 U.S.C. § 727(b). The creditor bears the burden to prove an exception to discharge by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287-88, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 680 (11th Cir. 1993). Courts narrowly construe exceptions to discharge against the creditor and in favor of the debtor. *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301 (11th Cir. 1994); *St. Laurent*, 991 F.2d at 680; *Gaddy*, 977 F.3d at 1056. "Debt" is defined by the Bankruptcy Code as "liability on a claim," and "claim" is defined as "(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,

11

unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to

an equitable remedy for breach of performance if such breach gives rise to a right to

payment, whether or not such right to an equitable remedy is reduced to judgment, fixed,

contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." 11 U.S.C.

§§ 101(12), (5).

1. *Section 523(a)(2)(A)*

Section 523(a)(2)(A) provides: "(a) A discharge under section 727. . . does not

discharge an individual debtor from any debt— . . . (2) for money, property, services, or

an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false

pretenses, a false representation, or actual fraud, other than a statement respecting the

debtor's or an insider's financial condition. . . ." 11 U.S.C. § 523(a)(2)(A).  To succeed in

proving that a debt arose from a false representation under section 523(a)(2)(A), a

creditor must prove that the debt arose from a false representation made with the intention

of deceiving the creditor, upon which the creditor justifiably relied.  *In re Adetayo*, 2020

WL 2146511, at *2 (Bankr. N.D. Ga. May 5, 2020); *Bartenwerfer v. Buckley*, 2023 WL

2144417, at *1 (U.S. Feb. 22, 2023).  Similarly, to establish a claim under false pretenses,

the creditor must prove the debt arose from an omission or implied misrepresentation that

was "promoted knowingly and willingly" and that created "a contrived and misleading

understanding of the transaction on the part of the" of the creditor and wrongfully induced

12

the creditor to advance money, property, or credit.  *Id*.  Yet "[f]alse pretenses, a false representation and actual fraud are distinct routes to nondischargeability under this Section," and a plaintiff can succeed in excepting a debt from discharge for "actual fraud" without proving a misrepresentation.  *In re Wisner*, 608 B.R. 589, 597 (Bankr. N.D. Ga. 2019) (citing *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 359, 136 S. Ct. 1581, 1586, 194 L. Ed. 2d 655 (2016)).  "Actual fraud under Section 523(a)(2)(A) embraces 'all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another ... [I]t includes all surprise, trick, cunning, dissembling and any unfair way by which another is cheated.'"  *In re Vandeford*, 2015 WL 1736486, at *2 (Bankr. N.D. Ga. Apr. 13, 2015); *see also In re Alam*, 314 B.R. 834, 841 (Bankr. N.D. Ga. 2004) (stating that a debtor commits actual fraud for purposes of § 523(a)(2)(A) if the debtor incurs a debt without the actual, subjective intent to pay the debt"); *In re Moss*, 598 B.R. 508, 516 (Bankr. N.D. Ga. 2019) (holding that plaintiff pled a claim under § 523(a)(2)(A) by alleging that the debtor "had no intention of using the loan proceeds for business development").

Relevant to this case, whatever route a plaintiff takes, it must establish that the defendant owes it a "debt" because "money, property, services, . . . or credit" were obtained through fraud.  *Cohen v. de la Cruz*, 523 U.S. 213, 220, 118 S. Ct. 1212, 1217, 140 L. Ed. 2d 341 (1998); *see also Husky,* 578 U.S. at 365 ("If [the] recipient [of a

fraudulent transfer] later files for bankruptcy, any debts 'traceable to' the fraudulent conveyance . . . will be nondischargable under § 523(a)(2)(A).") (internal citations omitted); *Gaddy,* 977 F.3d at 1056 (holding that a debt created by ordinary guaranty was not nondischargeable under § 523(a)(2)(A) simply because debtor engaged in post-debt conduct to avoid paying the debt); *Wisner*, 608 B.R. at 597 ("The Court, in *Cohen v. De La Cruz,* held that 'the phrase to the extent obtained by' in § 523(a)(2)(A) modifies 'money, property, services, or ... credit'—not 'any debt.'"); *In re Vanwinkle*, 562 B.R. 671, 677–78 (Bankr. E.D. Ky. 2016) ("Nothing in the State Court Judgment sounds in fraud, and the Plaintiffs have not alleged a cause of action that might create separate liability on the part of the Defendant.").  "Therefore, in the suit at bar, in order for [Zurich] to establish that [Hardin's] personal liability for the [debt] is non-dischargeable, [Zurich] must show the following: (1) money was obtained; (2) obtaining the money was done through . . . actual fraud; and (3) as a result of these circumstances, a personal debt of [Hardin] was created."  *In re Ritz*, 567 B.R. 715, 762 (Bankr. S.D. Tex. 2017); *In re Thompson*, 585 B.R. 890, 914 (Bankr. W.D. Okla. 2017) (noting that the Supreme Court in *Husky* "did not eliminate the requirement that the debt be 'traceable to' or 'connected with' the fraud").

### 2. *Section 523(a)(6)*

Similarly, § 523(a)(6) excepts from discharge any debt "*for* willful and malicious

14

injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6) (emphasis added).  "'Injury' means the violation of another's legal right or the infliction of an actionable wrong," and is not "confined to physical damage or destruction," as "an injury to intangible personal or property rights is sufficient." *In re Fairgrieves*, 426 B.R. 748, 757 (Bankr. N.D. Ill. 2010).  "'A debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury.'" *Gaddy*, 977 F.3d at 1058 (quoting *Kane v. Stewart Tilghman Fox & Bianchi, P.A. (In re Kane)*, 755 F.3d 1285, 1293 (11th Cir. 2014)).  "And '[m]alicious means wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.'" *Id*.; *see also In re Smith*, 592 B.R. 390, 395 (Bankr. N.D. Ga. 2018) (Hagenau, J.); *In re Watson*, 2019 WL 5388061, at *3 (Bankr. N.D. Ga. Oct. 18, 2019).  The plaintiff must show the debtor "had a subjective motive to inflict injury or believed his conduct was substantially certain to cause injury." *Hot Shot Kids, Inc. v. Pervis (In re Pervis)*, 512 B.R. 348, 376 (Bankr. N.D. Ga. 2014) (Hagenau, J.). The Court may infer the debtor's subjective intent from the surrounding circumstances. *Id*.  Again, the debt must be "the 'result of,' 'with respect to,' or 'by reason of'" an injury caused by the defendant's willful and malicious conduct. *Id*.

In this context, "injury" is a legal injury, not simply general harm to a person or entity. *In re Betancourt*, 2015 WL 3500322, at *6 (B.A.P. 9th Cir. 2015) ("In order to say

that an act caused injury to the creditor himself within the meaning of § 523(a)(6), the act must be such that it gives rise to a legally cognizable claim which could result in a monetary judgment."). For this reason, "actions taken by a debtor after a debt is incurred, even if in an effort to thwart a creditor's collection efforts by fraudulently conveying assets," do not "create a separate injury for the purposes of § 523(a)(6)." *In re Gaddy,* at 1058-59 (noting that plaintiff had failed to establish "cognizable injury" or that the debtor was liable for a separate, new debt due to his fraudulent actions to avoid plaintiff's collection efforts); *see also In re Saylor*, 108 F.3d 219, 221 (9th Cir. 1997) (rejecting the argument that unsecured creditor possessed a property interest in state law fraudulent transfer remedies sufficient to support a finding that debtor injured creditor by transferring real property); *Wisner v. Piedmont Bank*, 2021 WL 6535947, at *11 (N.D. Ga. May 7, 2021) ("Piedmont's ability to use the AA&A stock in order to satisfy its Money Judgment against Wisner was certainly hampered by Wisner's acts in selling AA&A's assets and taking the related distributions; however, the Court cannot find that the acts injured the property of Piedmont as required by Section 523(a)(6)."); *In re Diget*, 2021 WL 4484871, at *12 (Bankr. N.D. Ga. Sept. 30, 2021) ("Facts able to satisfy this standard typically require the creditor to have a security interest in the property transferred or a judgment on the fraudulent transfer claim at the time of the nondischargeability complaint."); *Matter of Polk,* 2020 WL 762215, at *13 (Bankr. M.D.

16

Ga. Feb. 14, 2020) ("The debt which Kapitus sought to have declared nondischargeable did not arise from an injury by Debtor to Kapitus' property. Rather, this debt was created when the two contracts were signed and Kapitus advanced funds pursuant thereto. Thus, Kapitus has no claim under § 523(a)(6)."); *In re Virani*, 2016 WL 429787, at *3 (Bankr. N.D. Ga. Jan. 29, 2016) ("As with dischargeability claims under 11 U.S.C. § 523(a)(2), for a debt to be nondischargeable under Section 523(a)(6), the debt must have been incurred as a result of the willful and malicious injury. Willful and malicious behavior after the debt is incurred is not sufficient to make the debt non-dischargeable.") (citation omitted).[3]

Courts have struggled to apply § 523(a)(6) in the case of purely economic injuries to avoid expanding the exception to cover debts arising from a "simple" breach of contract. *See In re Gagle*, 230 B.R. 174, 181 (Bankr. D. Utah 1999) ("*Geiger* indicates that a knowing breach of contract alone is not enough to render a debt nondischargeable. The Court in *Geiger* stated, "[a] construction so broad would be incompatible with the 'well-known' guide that exceptions to discharge 'should be confined to those plainly expressed.'"); *In re Ferreira*, 608 B.R. 300, 307 (Bankr. N.D. Ga. 2019) (noting that §

---

[3] Conversely, the fraudulent transfer of a secured creditor's collateral can support a claim of willful and malicious injury to the creditor's property interest. *See In re Kirwan*, 558 B.R. 9, 14 (Bankr. D. Mass. 2016) ("The holding in *Saylor* suggests that to succeed on a claim under Bankruptcy Code § 523(a)(6) on the basis of a fraudulent transfer, the plaintiffs must have an interest in what was transferred, be it a security interest in the property or a judgment setting aside the fraudulent transfer."); *Matter of Jimenez*, 608 B.R. 322, 332 (Bankr. M.D. Ga. 2019) ("Defendants in this case assisted in the transfer of Plaintiff's collateral to Village for less than reasonably equivalent value. This action was substantially certain to cause injury to Plaintiff.").

523(a)(6) "requires more than just a knowing breach of a contract").  In *In re Grasso*, 497 B.R. 434, 445–46 (Bankr. E.D. Pa. 2013), the court explained that § 523(a)(6) should be interpreted in a way that avoids "rendering all breach of contract claims nondischargeable" and noted that courts employ varying methods to ensure that a "limiting principle" applies.  "[S]ome courts have required a breach be accompanied by an intentional tort such as conversion." *Id*. (citing *In re Coley*, 433 B.R. 476, 499 (Bankr. E.D. Pa. 2010); *Aldus Green Co. v. Mitchell (In re Mitchell)*, 227 B.R. 45, 52 (Bankr. S.D.N.Y. 1998)); *see also In re Kamps*, 575 B.R. 62, 85 (Bankr. E.D. Pa. 2017) (finding breach of contract was not willful and malicious injury where there was "no allegation or evidence that the Debtor engaged in any tortious conduct in connection with his failure to pay the underlying note"); *In re Pagan*, 564 B.R. 324, 326 (Bankr. N.D. Ill. 2017) ("An intentional breach of contract, however, is not enough to support a claim under § 523(a)(6) unless the debtor's conduct also gives rise to an independent tort.").  Under the approach adopted by the court in *Grasso*, the court will not find that an injury was malicious if the breach of the contract was motivated by the debtor's desire to "maximize her personal financial interests."  *Grasso*, 497 B.R. at 446 (citing *In re Brown*, 442 B.R. 585, 620 (Bankr. E.D. Mich. 2011)) ("actions that are calculated to benefit a debtor, with any harm to a plaintiff being a result of the debtor's reckless disregard for the plaintiffs [sic] economic interests, are not malicious for purposes of § 523(a)(6)"); *In re Harland*,

235 B.R. 769, 779 (Bankr. E.D. Pa. 1999) (holding that debtor's conduct was intended to maximize his personal financial interests and therefore not sufficient to exempt claim pursuant to § 523(a)(6)).

The circuit courts are similarly divided.  The Ninth Circuit Court of Appeals in *Lockerby v. Sierra*, 535 F.3d 1038, 1043 (9th Cir. 2008), held that "state-specific tortious conduct is required under § 523(a)(6)."  The Eighth Circuit Court of Appeals held that "a judgment for an intentional tort is not necessary to find judgment debt for a breach of contract nondischargeable," but the "willfulness requirement is met when the bankruptcy court finds facts showing that the debtor's conduct accompanying the breach of contract amounted to an intentional tort against the creditor."  *In re Luebbert*, 987 F.3d 771, 782-83 (8th Cir. 2021) ("Because Luebbert's conduct accompanying his breach of contract satisfied the elements of conversion under Missouri law, he inflicted a willful injury on GCS.").  In *In re Williams*, 337 F.3d 504 (5th Cir. 2003), the Fifth Circuit Court of Appeals "expressly rejected a separate tortious conduct requirement," *see id.* at 782, and in *In re Kane*, the Eleventh Circuit, citing *Williams,* held that a "knowing breach of a clear contractual obligation that is certain to cause injury may prevent discharge under Section 523(a)(6), regardless of separate tortious conduct," 755 F.3d 1285, 1295–96 (11th Cir. 2014).[4]   Like the Fifth Circuit, the Eleventh Circuit has stated that "'the

---

[4]  It is not clear from the facts of *In re Kane* that the debt at issue arose from a breach of a contract.  In *Kane*, the

dischargeability of contractual debts under Section 523(a)(6) depends upon the knowledge and intent of the debtor at the time of the breach, rather than whether conduct is classified as a tort[.]'" *In re Monson*, 661 F. App'x, 675, 683 (11th Cir. 2016) (citing *Kane*, 337 F.3d at 510). Nonetheless, following the court's decision in *Monson*, the court held in *Gaddy*, that the "actions taken by a debtor after a debt is incurred, even if in an effort to thwart a creditor's collection efforts by fraudulently conveying assets," do not "create a separate injury for the purposes of § 523(a)(6)." *Gaddy,* at 1058-59 (noting that plaintiff had failed to establish "cognizable injury" or that the debtor was liable for a separate, new debt due to his fraudulent actions to avoid plaintiff's collection efforts where the original debt was liability on a guarantee that all parties agreed was not tainted by fraud). Thus, the Eleventh Circuit has, since *Monson*, clarified that the willful and malicious injury must have created the debt at issue. *Id*.

C.    *Analysis*

In support of the Motion, Hardin argues that Zurich bears the heavy burden of proof and cannot meet it because, even if proven, the facts alleged in the Complaint do

---

parties were attorneys jointly representing clients. One attorney secretly settled the case in a manner that cut the other out of a significant amount of attorney's fees. The debt was liquidated by the state court. On appeal, the Florida court of appeals specifically noted that the judgment was entered for damages arising from unjust enrichment and that "there was no express contract addressing how the proceeds of a secret, global undifferentiated settlement of both PIP and bad faith claims for all claimants were to be allocated." *Kane v. Stewart Tilghman Fox & Bianchi, P.A.*, 85 So. 3d 1112, 1114 (Fla. Dist. Ct. App. 2012). Accordingly, it appears that the debt at issue arose from the willful and malicious conduct involving the secret settlement rather than from the parties' prior contractual negotiations.

not state a claim under either § 523(a)(2)(A) or § 523(a)(6).  Hardin categorizes the factual allegations in the Complaint as pertaining to: "(i) the contractual debt owed by PMSG to Zurich . . . ; (ii) Hardin's status as PMSG's alter ego . . .; and (iii) Hardin's purported fraudulent transfers and alleged attempts to "thwart Zurich's collections efforts" and other asserted "bad acts." He argues that none of these allegations supports a finding of nondischargeability because the debt at issue arose from ordinary commercial transactions between PMSG and Zurich, rather than any of Hardin's "bad acts."   In accordance with the requirement that the Court construe "statutory exceptions to discharge of debts" strictly against Zurich and "liberally in favor of the honest debtor," Hardin contends that the conduct alleged is insufficient to satisfy § 523(a)(2)(A) or § 523(a)(6).  Accordingly, Hardin seeks judgment in his favor as to both.  In response, Zurich states that the Motion is defective in several respects; (1) it is "contrary to the applicable standard of review" because Hardin "makes inferences in his own favor, instead" of Zurich's; (2) the Motion "ignores the factual disputes and open questions that this Court previously identified in its ruling on Zurich's Motion for Partial Summary Judgment (ECF No. 24)"; and (3) it "rests on an improperly parsed application of the facts and law."

Hardin submits that, under Georgia law, the Alter Ego Judgment imposes the same debt on Hardin as that owed by PMSG and, therefore, the "debt" is a debt for unpaid

invoices ("a contractual debt"), rather than a debt for fraud or willful and malicious injury.  "This is because Hardin and PMSG are alter egos."  In support, Hardin points to *In re Cole,* 2022 WL 1096091, at *7 (M.D. Fla. Mar. 31, 2022), in which the district court concluded that, under the alter ego law of either Florida or Nevada, the "liability would be the same liability as that of [the corporation], not new or separate liability."  Because the debt at issue did not arise from the debtor's fraudulent acts, but from ordinary commercial activity, the fact that the debtor may have later engaged in fraudulent conduct to avoid liability was not relevant to the question of whether the debt was dischargeable under § 523(a)(2).  *Id.*  Hardin further submits that "the Florida and Georgia theories of alter ego are 'comparable,'" citing *Segment Consulting Mgmt., Ltd. v. Bliss Nutraceticals, LLC,* 2022 WL 252309, at *9 (N.D. Ga. Jan. 27, 2022).

Second, Hardin argues that the Complaint fails to allege any false pretense or false representations that led to the creation of the debt.  Similarly, because the debt arose prior to the alleged transfers of property by Hardin, the debt did not arise from the alleged actual fraud committed through the initiation or the receipt of any fraudulent transfer, as required for a claim to lie under § 523(a)(2)(A), or from any willful and malicious injury to Zurich, an unsecured creditor.  In support of this conclusion, Hardin cites *Gaddy*, 977 F.3d 105 (11th Cir. 2020).  Hardin contends that, in *Gaddy*, the Eleventh Circuit Court of Appeals held that, even if the debtor engaged in 'actual fraud' by conveying his assets, the

debt owed the creditor was not the result of fraudulent conduct and that the later conduct

that prevented the creditor from collecting its judgment did not injure the creditor within

the meaning of § 523(a)(6). In essence, the court held that, if the original debt was not for

money, property, or credit obtained by fraud, and the victim of a later fraudulent transfer

cannot demonstrate a separate legal injury that resulted from the post-debt conduct, the

debt is dischargeable.[5] Here, Hardin contends, the Complaint and its attachments

establish that the debt at issue arose only as a result of Zurich's unpaid invoices to PMSG

and PMSG's obligation to post additional collateral.

　　The facts of this case are strikingly similar to those of *Gaddy,* but are not identical.

In *Gaddy*, the debt at issue arose from the debtor's guarantee of two business loans made

by the creditor to a real estate development company. The development company

defaulted on the loans, and years later, the creditor obtained a judgment against the debtor

on his guarantee. Before and after the entry of the judgment, the debtor made actually

fraudulent transfers to an entity owned by himself, his wife, and his daughter in order to

---

[5] *Gaddy* recognizes the possibility that, if the victim of a fraudulent transfer can establish the existence of a separate debt arising from the fraudulent transfer, that debt could be nondischargeable under § 523(a)(2)(A) as a debt for money or property "obtained by . . . actual fraud." *See generally In Re Nadeau*, 2022 WL 4540235, at *12 (Bankr. N.D. Ohio Sept. 28, 2022) ("Accordingly, under Ohio law, fraudulent transfer can be a distinct cause of action, at least in the case of actual fraud."); *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 365, 136 S. Ct. 1581, 1589, 194 L. Ed. 2d 655 (2016) (noting that "the recipient of the transfer—who, with the requisite intent, also commits fraud—can 'obtai[n]' assets 'by' his or her participation in the fraud"). Zurich has not argued or cited to any authority to support a finding that Hardin is liable for a separate debt arising from the transfers of his assets or from having received assets from PMSG. As Hardin has noted, claims that Zurich may have had regarding the fraudulent transfers of Hardin's property became property of the bankruptcy estate, leaving Zurich without standing to pursue them. *See In re Martin*, 2019 WL 3543778, at *13 (Bankr. D. Conn. Aug. 2, 2019), aff'd, No. 3:20-CV-939 (SRU), 2021 WL 1670292 (D. Conn. Apr. 27, 2021). Because Zurich has not raised the issue, the Court does not address the possibility that Hardin is liable to Zurich as the transferee of PMSG's assets.

avoid payment to the creditor.  After the creditor filed a fraudulent transfer suit against the debtor and the transferees in federal court, the debtor filed a Chapter 7 bankruptcy case.  In that suit, the creditor "described [the debtor's] allegedly fraudulent transfers and asserted they had damaged [the creditor] by 'depriv[ing the creditor] of assets of [the debtor] that could be used to satisfy the judgment . . . ." *Gaddy*, 977 F.3d at 1054.

The Eleventh Circuit rejected the creditor's argument that its debt arose from fraud or willful and malicious injury. Affirming the bankruptcy court's grant of judgment on the pleadings in favor of the debtor, the court explained that, because § 523(a)(2)(A) "exempts from a debtor's discharge 'any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent *obtained by* . . .  false pretenses, a false representation, or actual fraud,'" the bankruptcy court and the district court properly concluded that the creditor's § 523(a)(2)(A) claim failed."  *Id*. at 1056.  In so holding, the court rejected the creditor's "efforts to expand case law to encompass the circumstances presented by this case."  *Id*.  Further, the court noted that the judgment at issue was entered against the debtor on the guarantee of a debt that no party asserted arose from fraud and that the only alleged fraud occurred years after the debt for the guarantee arose.  The court also addressed the argument that "dicta in, the Supreme Court's 2016 decision in *Husky International Electronics, Inc. v. Ritz*, 578 U.S. 356, 136 S. Ct. 1581, 194 L.Ed.2d 655 (2016)," supported the creditor's position.  The court explained that

*Husky* simply clarified that, *if* a creditor is owed a debt because of an actually fraudulent transfer, the debt can be one obtained through actual fraud, notwithstanding the absence of a misrepresentation.  In *Gaddy*, however, the complaint did not allege that the debtor owed the creditor a debt because of a fraudulent transfer, and the bankruptcy court held that the creditor could not do so because Alabama law does not provide a basis for damages against the transferor of the property.  *Id.* at 1057.  The court distinguished the facts of *Gaddy* from those in *Husky* and *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000), a case upon which *Husky* relied.  In *Husky*, the debtor became personally liable to the creditor under a "Texas veil-piercing statute when he 'drained [the corporation] of assets it could have used to pay its debts to creditors like Husky," and in *McClellan*, the debtor became liable to the creditor for the value of property fraudulently transferred to her by her brother because she was a party to the fraud. *Id.*  The *Gaddy* court concluded that "[n]either the Supreme Court nor the Seventh Circuit eliminated the requirement that for a debt to be exempt from discharge under § 523(a)(2)(A), the money or property giving rise to the debt must have been 'obtained by' fraud, actual or otherwise."  *Id.* Accordingly, only debts created by the fraudulent transfer "will be nondischarg[e]able under § 523(a)(2)(A)." *Id.*

The facts of this case are closer to those of *Husky* than the facts of *Gaddy* were, in that Hardin, like the debtor in *Husky*, became liable for what Hardin asserts is PMSG's

ordinary, contractual debt only when Zurich brought the alter ego suit.  One might argue that the Court should look at the events that caused Hardin to become personally liable for that debt, rather than the events that created PMSG's debt to Zurich.  But Hardin argues that, under Georgia law, if Hardin was the alter ego of PMSG, it is as if he was liable for the debt since its inception and the debt retains the same character, and Zurich has not argued otherwise. The District Court in *In re Cole* relied on this legal conclusion to affirm the bankruptcy court's decision that a debt owed by the debtor as the alter ego of his company was not obtained by fraud.  An appeal of that decision is pending before the Eleventh Circuit Court of Appeals.  *See PRN Real Estate & Invs,, Ltd. v. Cole*, Case No. 22-11118.  For now, the Court will follow *In re Cole*.  If that legal conclusion is reversed on appeal, the Court will revisit the issue.[6]

This case is also more like *McClellan* than *Gaddy* was, in that the Complaint alleges that Hardin, like the debtor's sister in *McClellan*, was the transferee of assets fraudulently transferred by PMSG at a time when Zurich was PMSG's creditor.  The Complaint does not allege that Zurich ever sued Hardin in his capacity as either the

---

[6] Other decisions have analyzed this issue differently.  In *In re Thompson*, 555 B.R. 1, 14 (B.A.P. 10th Cir. 2016), the court analyzed the creditor's debt as that arising from a veil-piercing suit rather than the underlying debt of the entity, noting that "the debt Hatfield seeks to except from discharge is his fraud-based corporate veil piercing claim, not Promise McLoud, LLC's debt based on providing substandard care."  The court also noted that the result was consistent with *Husky*, in which "the conduct that was the basis for the state law fraudulent conveyance claim and the claim for actual fraud under § 523(a)(2)(A) was substantially the same."  *Id*.  The Court assumes without deciding that differences in the applicable alter ego and veil piercing theories are responsible for this distinction.

transferor or the transferee of PMSG's assets, and Zurich has not argued that it has a separate claim against Hardin for such conduct or for his receipt of PMSG's assets.[7]  *See, e.g., In re Jennings*, 670 F.3d 1329, 1333 (11th Cir. 2012) (holding that, where the creditor had "obtained a judgment on his fraudulent transfer claim at the time he initiated a nondischargeability claim under § 523(a)(6)," and the judgment included a finding that the debtor had participated in a conspiracy to fraudulently transfer property under California law, the liability established thereunder could be found nondischargeable under § 523(a)(6) if the debtor was substantially certain that the transfer would injure the creditor's ability to collect a debt from her ex-husband).

The court in *Gaddy* went on to consider and reject the creditor's argument that the debtor's after-the-fact fraudulent transfers made to avoid payment of the creditor's debt created a debt for a willful and malicious injury to the creditor.   Again, the court explained that the creditor was skipping "an important step in its § 523(a)(6) analysis" because it had failed to show that the debt owed by the debtor was "for" a willful and malicious injury to the creditor or the creditor's property rather than "for" a guarantee of

---

[7]  Zurich is not precluded from further litigating the nature of the debt, however.  *See In re Luebbert*, 987 F.3d 771, 782 (8th Cir. 2021); *In re Piercy*, 21 F.4th 909, 926 (6th Cir. 2021) (noting that "a plaintiff may submit new evidence in the bankruptcy court in an attempt to establish the elements of § 523(a)"); *In re Oslin*, 584 B.R. 363, 368 (Bankr. N.D. Okla. 2018) ("In attempting to except a prepetition judgment debt from discharge in bankruptcy, however, the judgment creditor is not precluded from asserting that the debt accrued as a result of the debtor's "willful and malicious" conduct, if those elements were not actually litigated and decided in the previous action."); *In re Kane*, 470 B.R. 902, 943 (Bankr. S.D. Fla. 2012), aff'd sub nom. *Kane v. Stewart Tilghman Fox & Bianchi, P.A.*, 485 B.R. 460 (S.D. Fla. 2013), aff'd sub nom. *In re Kane*, 755 F.3d 1285 (11th Cir. 2014); *In re Dilworth*, 2022 WL 987044, at *15 (Bankr. D. Conn. Mar. 31, 2022) (citing *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979)).

another party's debt. *Id.* at 1058 (citing *Cohen*, 523 U.S. at 220, 118 S.Ct. at 1212). The court reiterated that "actions taken by a debtor after a debt is incurred, even if in an effort to thwart a creditor's collection efforts by fraudulently conveying assets," do not "create a separate injury for the purposes of § 523(a)(6)." *Id.* at 1059;[8] *see also In re Saylor,* 108 F.3d 219, 221 (9th Cir. 1997) (holding that the creditor's "claim that he possesses a property interest in the fraudulent transfer remedies provided by state law does not fit within the definitions of either 'debt' or 'property' for purposes of section 523(a)(6), and runs counter to the long-standing principle that exceptions to dischargeability are to be narrowly construed"); *In re Betancourt*, 2017 WL 3482035, at *7 (B.A.P. 9th Cir. Aug. 14, 2017), *aff'd*, 756 F. App'x 741 (9th Cir. 2019) (holding that a claim for monetary damages against the debtor "arising from her receipt of the fraudulently transferred property" under California law was sufficient injury for purposes of § 523(a)(6)); *In re Vanwinkle*, 562 B.R. 671, 679 (Bankr. E.D. Ky. 2016).  Finally, the court noted that, even if the bankruptcy court erred in its conclusion that Alabama's fraudulent transfer law did not permit a claim for damages against the debtor as the transferor, Alabama law would have prevented a double recovery for the same harm.  In essence, the court found that the creditor could not get another judgment against the debtor arising from the fraudulent

---

[8] *Gaddy* leaves open the possibility that an award of punitive damages against the transferor of assets could be a debt for a separate injury.  The creditor made this argument, but the court refused to consider it because the claims were "vague" and the creditor had not raised the issue before the bankruptcy court.  *Gaddy*, 977 F.3d at 1060.  Zurich has not argued that it is entitled to a separate award for punitive damages against Hardin due to his fraudulent transfer of his assets, and neither party has discussed whether such a claim would belong to Zurich or the bankruptcy estate.

transfer because it could not show an "independent, freestanding harm" that arose from the fraudulent transfers themselves.  Rather, "it complained only that the transfers kept it from collecting the underlying debt." *Gaddy*, 977 F.3d at 1060.

Zurich does not appear to oppose Hardin's interpretation of *Gaddy* and the application of its legal conclusions to this case.  Nonetheless, it strongly disagrees that a judgment on the pleadings is appropriate, asserting that the Complaint does contain facts from which the Court could conclude, if inferences are properly drawn in Zurich's favor, that "Hardin never intended to pay" Zurich.  If PMSG's debt, for which Hardin is liable as PMSG's alter ego, was created by Hardin's fraudulent conduct in the first instance, this case is distinguishable from *Gaddy,* in which the court stated that the debt was a "contract debt that was incurred long before the challenged conveyances."  *Gaddy*, 977 F.3d at 1058.  Zurich also urges the Court to conclude that the Complaint does "not allege that Hardin merely made after-the-fact fraudulent transfers following the breach of the contract," but rather "intentionally breached the contract in the first place, as evidenced by the totality of the circumstances, including the actions Hardin took over the course of years that were intended to deplete his and his alter ego's assets in order to cheat Zurich for the benefit of himself and his family."  Zurich's Brief, at 11-12.  A debt that arose from Hardin's willful and malicious breach of the contract, rather than from the nonfraudulent negotiations for the insurance program, could support a finding of

29

nondischargeability under § 523(a)(6).  *Monson*, 661 F. App'x at 683; *In re Luebbert*, 987 F.3d 771, 782 (8th Cir. 2021); *see also In re Wilson*, 2017 WL 1628878, at *8–9 (Bankr. N.D. Ohio May 1, 2017) (finding that evidence of post-judgment real estate transfers did not support an inference of debtor's fraudulent intent regarding the original contract, but allowing for the possibility that, in a case in which the evidence around the transfers was "contemporaneous with performance of the contract, the record might paint a different picture of an overarching scheme within the broader standard of actual fraud").  But the Court agrees with Hardin that subsequent conduct engaged in to avoid paying a debt for which he was already liable could not transform the original debt into a debt "for" a willful and malicious injury any more than the *Gaddy* debtor's fraudulent transfers transformed his debt on a guarantee into a debt for a willful and malicious injury.

Here, although the Complaint focuses primarily on Hardin's conduct after PMSG became liable to Zurich, the Court agrees with Zurich that the Complaint could be read, with inferences drawn in Zurich's favor, to assert a claim for fraud at the inception of the debt.  In its brief, Zurich asserts that the Complaint alleges that Hardin caused PMSG to enter the insurance program without the intent to pay Zurich.  The Complaint placed Hardin on notice that Zurich claimed "false pretenses, false representations, and/or actual fraud" based on "all of his conduct alleged above, including but not limited to: (a) PMSG's debt incurred under its insurance program with Zurich . . . ."  The Complaint is

30

replete with allegations regarding Hardin's post-contract diversion of PMSG's funds, from which the Court could infer that Hardin never intended for PMSG to pay Zurich.[9]  If proven, such facts could support a finding of nondischargeability under § 523(a)(2)(A). At this stage, the Court is not prepared to find that the Complaint fails to state a claim that the debt arose from fraud.  *See generally Mills v. Seawright*, 2021 WL 785105, at *5 (S.D. Miss. Mar. 1, 2021) (finding that a debtor's intent to deceive can be inferred from the circumstances); *In re Casali*, 526 B.R. 271, 275 (Bankr. N.D. Ill. 2015) (inferring lack of subjective intent to perform a contract from debtor's later conduct and noting that, "it may still be possible for defendant to argue that only an innocent breach of contract occurred, but deciding which conclusion to draw requires evidence at trial").[10]

The Court is less convinced that the Complaint alleges sufficient facts from which the Court could conclude that PMSG's debt to Zurich is the result of a willful and malicious breach of the contract.  If Zurich's theory is that the debt is the result of a willful and malicious injury because PMSG never intended to perform the contract, the Court questions whether, given the loss-sensitive nature of the insurance program, the

---

[9]  The Complaint spends little time on the facts surrounding the contract negotiations or Hardin's involvement therein, but an attachment to the Complaint, the Arbitration Award, discloses that Debra Hubbard signed the agreements on behalf of PMSG.  (Doc. 1, Exh. A at 13-14).  The Arbitration Award also discusses Zurich's allegations that Hubbard was essentially a figure head controlled by Hardin, and the Complaint alleges in numerous places that Hardin had the ability to cause PMSG to act.

[10]  The Court notes, however, that the Arbitration Award referenced above makes a finding that "prior to April 2013" there was "substantial and ongoing performance by both Respondents and Zurich."  Doc. 1, Exh. A at 12. This is some evidence against a finding that PMSG lacked the intent to perform at the inception of the contract.

Complaint includes sufficient facts to support a finding that PMSG knew with substantial

certainty that Zurich would suffer losses even if PMSG failed to perform. If Zurich's

theory is that PMSG's breach of the contract by failing to pay and post collateral caused a

willful and malicious injury, as noted above, under *Gaddy*, actions taken after a debt has

been incurred to avoid payment of that debt do not constitute an injury for purposes of §

523(a)(6). The Court would benefit from additional briefing from the parties targeted at

the question of whether the debt (or any portion of it) arose at the time PMSG entered the

contract or at the time PMSG failed to pay Zurich. For now, the Court will deny the

Motion as it pertains to the § 523(a)(2)(A) claim and permit the parties an opportunity to

file further briefing as to the § 523(a)(6) claim.

## CONCLUSION

For the reasons stated above,

IT IS ORDERED that the Motion (Doc. 54) is **DENIED** in part and deferred in

part;

IT IS FURTHER ORDERED that Hardin shall have thirty (30) days from the date

of the entry of this Order within which to file a brief in support of the Motion, and Zurich

shall have thirty (30) days from the date upon which Hardin's brief is filed within which

to respond.

## END OF DOCUMENT

32

**Distribution List**

Elizabeth Campbell
Locke Lord LLP
Terminus 200, Suite 1200
3333 Piedmont Road, NE
Atlanta, GA 30305

Steven T. Whitmer
Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606

Julie L. Young
Locke Lord LLP
111 South Wacker Drive
Chicago, IL 60606

Leon S. Jones
Jones & Walden, LLC
699 Piedmont Avenue NE
Atlanta, GA 30308

Leslie M. Pineyro
Jones and Walden, LLC
699 Piedmont Avenue NE
Atlanta, GA 30308

Henry C. Hardin, III
3245 Town Manor Circle
Dacula, GA 30019